UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

John J. Bordulis, III,

    Plaintiff,

    v.                                              Civil Action No. 1:12-CV-30

Michael J. Astrue,
Commissioner of Social Security,

    Defendant.

## REPORT AND RECOMMENDATION
(Docs. 10, 11)

Plaintiff John Bordulis brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the Court are Bordulis's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 11). For the reasons stated below, I recommend that Bordulis's motion be GRANTED, in part; the Commissioner's motion be DENIED; and the matter be REMANDED for further proceedings and a new decision.

## Background

Bordulis was forty-nine years old on his alleged disability onset date of October 1, 2009. He has a GED and two semesters of college for hotel management. His work experience is as a construction worker, a waiter, and a cook/sous-chef. He is

divorced, has two adult daughters, and has been homeless since November 2010, living on general assistance and food stamps.

In April 2000, Bordulis fell approximately thirty feet while doing construction work, resulting in the fracture of two ribs and five lower lumbar vertebrae and severe deterioration in his right paraspinal musculature.  Since then, he has had chronic low back pain.  Despite this pain, after approximately nine months of rehabilitation, he returned to work as a cook in August 2000.  By 2009, Bordulis asserts that his pain had increased to the point where he could no longer work.  At the October 2011 administrative hearing, he testified that he has "unbelievable pain every day, every minute" (AR 34), and that "the pain is just getting worse and worse and worse" (AR 35).

In 2003, Bordulis was diagnosed with Hepatitis C.  Thereafter, while still working, he underwent eight months of Interferon[1] treatment.  He continues to have chronic active Hepatitis C, which he claims causes him extreme fatigue and lack of energy.  Bordulis also reports that he suffers pain in his knee and left forearm due to injuries sustained in a 2003 car accident; pain in his ankle, which he broke as a child; and pain in his fingers and hands, limiting his ability to hold onto anything for very long.  (AR 43-47.)  Additionally, he asserts that he is depressed mainly due to chronic pain and homelessness.  His daily activities consist of gathering small pieces of wood to make fires for warmth.  (AR 36, 44-45.)

---

[1] "Interferon is an antiviral agent used in the treatment of certain kinds of hepatitis.  It is 'given by . . . injection, is expensive, and produces bothersome flu-like side effects in almost all patients.'" *Sherman v. Apfel*, 141 F.3d 1185, 1998 WL 163355, at *9 n.2 (10th Cir. 1998) (quoting THE MERCK MANUAL OF DIAGNOSIS & THERAPY 906 (16th ed. 1992)).

In March 2010, Bordulis filed an application for disability insurance benefits, alleging that he stopped working on October 1, 2009 because of his back injury and Hepatitis C. (AR 174.) In an updated report, Bordulis stated that, starting on October 1, 2010, his back pain was much worse and he was constantly fatigued, had no appetite, and did not sleep. (AR 208.) He also stated that he was stressed and depressed, and could not bend, sit, or stand without severe pain. (*Id.*) Bordulis's application was denied initially and upon reconsideration, and he timely requested an administrative hearing. The hearing was conducted on October 7, 2011 by Administrative Law Judge ("ALJ") Thomas Merrill. (AR 27-68.) Bordulis appeared and testified, and was represented by an attorney. In addition, a vocational expert ("VE") and Bordulis's 21-year-old daughter, Amy Bordulis, appeared and testified at the hearing.

On November 3, 2011, the ALJ issued a decision finding that Bordulis was not disabled under the Social Security Act from his alleged onset date of October 1, 2009 through the date of the decision. (AR 11-21.) On January 13, 2012, the Appeals Council denied Bordulis's request to review the ALJ's decision, making the ALJ's decision final. (AR 1-3.) Having exhausted his administrative remedies, Bordulis filed the Complaint in this action on February 13, 2012. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so

engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Bordulis had not engaged in substantial gainful activity since his alleged onset date of October 1, 2009. (AR 13.) At step two, the ALJ found that Bordulis had the following severe impairments: "s/p multiple spinal fractures (4/2000); degenerative disc disease lumbar spine; and hepatitis C." (*Id.*) Conversely, the ALJ found that there was insufficient evidence of a medically determinable mental impairment, and that Bordulis's arm, knee, and hand problems did not rise to the level of severe impairments. (AR 15.) At step three, the ALJ found that none of Bordulis's impairments, alone or in combination, met or medically equaled a listed impairment. (*Id.*)

Next, the ALJ determined that Bordulis had the RFC to perform "light work," as defined in 20 C.F.R. § 404.1567(b), with the following limitations:

> [Bordulis] is able to lift and/or carry up to 20 pounds frequently; to stand and/or walk for up to 6 hours in an 8-hour workday; and to sit for up to 6 hours in an 8-hour workday. He has unlimited use of his hands and feet to operate controls and to push and/or pull. He is unable to climb ladders. He is able to frequently balance and to occasionally stoop, kneel, crouch and/or crawl. He must avoid concentrated exposure to vibration.

(AR 16.) Given this RFC, the ALJ found that Bordulis was unable to perform his past relevant work as a construction worker, a cook, or a sous chef. (AR 19-20.) Based on testimony from the VE, however, the ALJ determined that Bordulis could perform other jobs existing in significant numbers in the national economy, including the jobs of sales attendant, fast food worker, and retail marker. (AR 20-21.) The ALJ concluded that Bordulis had not been under a disability from the alleged onset date of October 1, 2009 through the date of the decision. (AR 21.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact[-]finder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971);

*Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

**I.      The ALJ Erred in His Analysis of Bordulis's Mental Impairment.**

As noted above, the ALJ found that there was "a lack of evidence to support the existence of a medically determinable mental impairment."  (AR 15.)  Based on my review of the record, I disagree, and find the ALJ erred in failing to consider certain evidence which supports the existence of a medically determinable mental impairment.

In a March 2011 Disability Evaluation, psychologist Dean Mooney, Ph.D. and clinician Danielle Bergeron, M.S., stated as follows:

- "[Bordulis] needed to be redirected numerous times throughout the evaluation to stay on topic.  [He] went off on tangents about politics and the Earth several times during the evaluation."  (AR 451.)

- "[Bordulis's] speech volume was loud and his rate was rapid.  His overall affect was anxious."  (*Id.*)

- "[Bordulis's] thought processes were neither logical nor goal[-]directed.  *He displayed evidence of psychosis and severe thought disturbance*."  (*Id.* (emphasis added).)

- "[Bordulis] is unable to relate to others."  (AR 453.)

- "[Bordulis] is not capable of managing funds on his own behalf."  (AR 455.)

Despite relying on other aspects of Dr. Mooney's and Bergeron's Evaluation, the ALJ made note of none of these meaningful findings in his decision. Nor did the ALJ recognize that, in their Evaluation, Dr. Mooney and Bergeron: (a) referred Bordulis to a psychiatrist, (b) "strongly recommended" that Bordulis see a mental health counselor; and (c) assigned to Bordulis a GAF[2] score of 40. (*Id.*) Significantly, a GAF score of 40 places Bordulis at the upper end of the "31-40" category, where a person experiences "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

It is unclear whether the ALJ was aware of these findings in Dr. Mooney's and Bergeron's Evaluation,[3] given that the only aspects of the Evaluation discussed by the ALJ in his decision were (a) the findings that Bordulis was not taking medication around the time the report was completed, and had not consulted with a mental health counselor or participated in physical therapy, despite recommendations to do so; and (b) the

---

[2] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000)).

[3] It is also unclear whether these findings were considered by agency consultant Dr. Russell Phillips, whose April 2011 Consultative Examination report the ALJ relied on (along with Dr. Mooney's and Bergeron's Evaluation) in determining that Bordulis did not have a medically determinable mental impairment. (*See* AR 14 (citing AR 81).)

8

diagnoses of malingering[4] and noncompliance with treatment. (AR 14 (citing AR 453, 455).) But the Evaluation does not explain the basis for these diagnoses, and does not address why Bordulis had not taken medication, consulted with a mental health counselor, or participated in physical therapy. Moreover, the Evaluation fails to attempt to rationalize the incongruity between the diagnoses of malingering and noncompliance on the one hand, and the clinical findings that Bordulis exhibited evidence of psychosis and severe thought disturbance and had a GAF of 40 on the other hand. More importantly, *the ALJ* appears to have adopted the diagnoses of malingering and noncompliance with treatment, without considering other findings in the Evaluation and, more significantly, without attempting to decipher why Bordulis failed to comply with particular recommended treatment. The ALJ should have considered the reasons provided by Bordulis for such failure, and determined whether those reasons were justifiable. *See McGregor v. Comm'r of Soc. Sec.*, No. 10-CV-1483 (TJM/VEB), 2012 WL 2873559, at *10 (N.D.N.Y. June 1, 2012); *Pimenta v. Barnhart*, No. 05 Civ. 5698(JCF), 2006 WL 2356145, at *6 (S.D.N.Y. Aug. 14, 2006) (quoting SSR 82-59, 1982 WL 31384, at *4 (1982)) ("In accordance with . . . SSR 82-59, a claimant may have legitimate reasons for refusing treatment. . . . '[A] full evaluation must be made in each case to determine whether the individual's reason(s) for failure to follow prescribed treatment is justifiable.'"). Social Security Ruling 96-7P, 1996 WL 374186, at *7 (1996),

---

[4] "Malingering" is defined as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 739 (4th ed. 2000).

9

provides: "[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment *without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment*." (Emphasis added.) This rule has particular importance in cases involving a mental impairment, and courts have criticized "the use of a lack of treatment to reject mental complaints[,] both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Day v. Astrue*, No. 07 CV 157, 2008 WL 63285, at *5 n.7 (E.D.N.Y. Jan. 3, 2008) (quoting *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299-1300 (9th Cir. 1999)) (internal quotation omitted).

Bordulis's patchy record of medical treatment appears to have been partially due to the fact that he was homeless for a substantial portion of the alleged disability period, and had no money, no medical insurance, and no consistent primary care provider. (AR 36-37, 49, 116, 382, 389.) Also, Bordulis testified at the administrative hearing that he has had difficulty finding a doctor who was able to treat his conditions, stating that he had "gone through every doctor there is in Rutland, and nobody says they can do anything for me." (AR 49; *see also* AR 54 (stating he "tried to" obtain treatment for his depression, but he "got the suicide hotline [and] it just made [the] call a mess").) Regarding his failure to seek mental health treatment and counseling, Bordulis asserted at the administrative hearing that he was not aware of the results of Dr. Mooney's and

Bergeron's Evaluation, including the referral to a psychiatrist and to mental health counseling, until his attorney advised him about it days before the administrative hearing. (AR 55.) With respect to Bordulis's failure to take medication, the record demonstrates that, although he was prescribed and took pain medication, including narcotics, at various times during the alleged disability period (*see, e.g.,* AR 47-48, 331-34, 381-83), during other periods, he refused such medication for fear of becoming addicted (*see* AR 212, 354).[5] Bordulis explained his choice not to take pain medication in a Disability Report: "My choice not to do drugs for my pain was because I felt I'd rather deal with this pain than be a junkie. But as time and this pain has increased and has become unbearable that philosophy has changed because I just cannot take the pain any longer." (*Id.*) Regarding Bordulis's failure to comply with recommendations to engage in physical therapy, the record demonstrates that Bordulis attempted physical therapy but stopped because it was not effective and increased his pain levels. (*See, e.g.,* AR 431 ("patient was adamant that physical therapy has not worked for him in the past"), 441, 488.) The ALJ's decision does not address these explanations for Bordulis's failure to take medication and comply with treatment recommendations. Finally, with respect to Dr. Mooney's and Bergeron's diagnosis that Bordulis was "[m]alingering" (AR 455), as noted above, it is unclear what the basis for this diagnosis was, especially considering that these examiners found that

---

[5] Pain medication also appears to have caused Bordulis to have mood swings which negatively affected his significant interpersonal relationships. At the administrative hearing, he described his experience with prescribed pain medication after his construction accident: "I threw my girlfriend out, I had nobody really to look after me, my mood swings were out of this world. And then I discovered that the doctor was giving me OxyContin[], which I found out was heroin, and I got off the drugs. And I swore I would never do the drugs anymore because it was just – it destroyed – I mean, the time I needed people around me the most was the time I got rid of everybody." (AR 48.)

Bordulis exhibited significant mental irregularities on examination (AR 451, 453, 455), and "strongly recommended" that he see a psychiatrist and a mental health counselor (AR 456). The ALJ failed to address this discrepancy in his decision.

In addition to failing to consider certain significant aspects of Dr. Mooney's and Bergeron's Evaluation (while relying on other aspects of it), the ALJ neglected to consider other evidence suggesting that Bordulis had a mental impairment. For example, August 2009 and December 2010 treatment notes from Rutland Primary Care include among reviews of Bordulis's "[s]ystems": "feeling poorly (malaise)," "anxiety," and "depression." (AR 331, 341.) And a November 2010 note from Rutland Regional Medical Center states: "Old records were reviewed [and] showed [Bordulis] . . . has a history of major depressive disorder and was supposed to be on antidepressants, however is not at this time." (AR 386.) Also significant, as the ALJ acknowledged, in 2003, Bordulis was admitted to the Rutland Regional Medical Center for stabilization of a diagnosed adjustment disorder. (AR 312.) The admission note indicated that Bordulis exhibited vegetative signs; and had frequent, intense, and prolonged suicidal ideation, as well as a history of road rage and poor anger control. (*Id.*) The ALJ quickly discounted the diagnosis of adjustment disorder on the grounds that there were "no medical records related to any subsequent follow-up treatment" and Bordulis returned to work through 2008. (AR 14 (citing AR 313).) As discussed above, however, the ALJ did not consider why Bordulis failed to follow-up with treatment. Finally, the ALJ failed to note that, in a September 2000 Evaluation Summary Report, Michelle Richard, P.T., stated that Bordulis "demonstrated marked frustration, agitation, irritability, mood swings and

occasional anger throughout testing." (AR 297.) Although ALJs are not required to discuss every piece of evidence in their decisions, *Brault v. Comm'r of Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012), particularly evidence from before the alleged disability period, the ALJ should have discussed some of this significant medical evidence before finding that Bordulis did not have a medically determinable mental impairment.

The ALJ's flawed analysis of Bordulis's mental impairment requires remand because it infected every subsequent step of the ALJ's decision, as the ALJ failed to include any mental health limitation in his RFC discussion and determination, and in the hypotheticals presented to the VE at the administrative hearing. *See Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) ("[E]ven if this Court concluded that substantial evidence supports the ALJ's finding that [the claimant's] mental impairment was nonsevere, it would still be necessary to remand this case for further consideration because the ALJ failed to account [for] [the claimant's] mental limitations when determining her RFC [and a] RFC determination must account for limitations imposed by both severe and nonsevere impairments.") (citing 20 C.F.R. § 404.1545(a)(2)). This omission was not harmless because the VE testified that, had the ALJ adopted Dr. Mooney's and Bergeron's findings that Bordulis displayed evidence of "psychosis" and "severe thought disturbance" (AR 451), he would not be able to maintain employment. (AR 67-68.)

## II. The ALJ Erred in His Analysis of the Medical Opinions.

The ALJ also erred in his analysis of the medical opinions. In August 2010, after reviewing the medical evidence, Dr. Kumar Swami, a non-examining agency medical

13

consultant, opined that Bordulis was able to stand, walk, and sit for six hours in an eight-hour workday, placing Bordulis within the "light work"[6] classification. (AR 396-97, *see also* AR 368-75.) In making this opinion, Dr. Swami disagreed with the medical opinion of Dr. Carl Runge, another non-examining agency medical consultant, who opined in July 2010 that Bordulis could stand and walk for only "2-3 hours per day because of aggravation of chronic back pain by activity," thus confining Bordulis to "sedentary"[7] work. (AR 369.) Dr. Swami's opinion is also at odds with the medical opinion of Dr. Donald Bicknell, *who examined Bordulis* in July 2010 at the request of Vermont Disability Determination Services. Among other things, Dr. Bicknell noted in his report that Bordulis's back was "very, very tender to right of L3," that Bordulis had "[e]ssentially no extension," and that Bordulis had "[s]evere low back pain secondary to trauma" and "Hepatitis C causing fatigue." (AR 367.) Dr. Bicknell concluded that Bordulis had "severe restriction of daily activities. Interests are there, but ability to do them curtailed." (*Id.*) The ALJ afforded "substantial weight" to Dr. Swami's opinion, and "limited weight" to the opinions of Drs. Runge and Bicknell, explaining that Dr. Swami's opinion was "consistent with the objective medical evidence of record as a whole," and that the opinions of Drs. Runge and Bicknell were "inconsistent with the medically documented objective findings of record as well as with [Bordulis's] limited

---

[6] The Second Circuit has described "light work" as follows: "The full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time." *Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (citing 20 C.F.R. § 404.1567(b)).

[7] To be capable of "sedentary work," "a person must be able to . . . stand or walk for a total of two hours in an eight-hour workday." *Carvey v. Astrue*, 380 F. App'x 50, 52 (2d Cir. 2010) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 n.3 (2d Cir. 1999); 20 C.F.R. § 404.1567(a)).

14

treatment history." (AR 18-19.)

The regulations provide that, in general, "more weight" is given to the opinion of a medical source who has examined the claimant than to the opinion of a source who has not. 20 CFR § 404.1527(d)(1); *see Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians"). Additionally, while the findings of non-examining analysts can, and often do, provide valuable supplemental support for an ALJ's decision, they should generally be afforded "little weight" in the overall disability determination. *Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990). Here, although Dr. Bicknell did not have an ongoing treatment relationship with Bordulis, he at least examined Bordulis on one occasion, as compared to Dr. Swami (and Dr. Runge), who merely reviewed the records in existence at the time of his assessment and formulated an opinion based thereon. The ALJ should have acknowledged this distinction and considered its on the comparable weight of the medical opinions.

There are other reasons why the ALJ's analysis of Dr. Swami's opinion is flawed. First, one of the ALJ's reasons for affording substantial weight to Dr. Swami's opinion was that it was consistent with the opinion of Bordulis's treating gastroenterologist, Dr. Howard Weaver, who stated in an August 2011 treatment note that Bordulis "'certainly seems strong enough and healthy enough to seek employment.'" (AR 19 (quoting AR 509).) But Dr. Weaver appears to have made that statement in the context of discussing Bordulis's Hepatitis C only; he did not treat Bordulis's back or mental health problems.

15

(*See* AR 508-09.) Second, Dr. Swami's opinion appears to be based largely on Bordulis's failure to take pain medication (*see* AR 396 ("There is no pain treatment") ("chronic pain . . . is un-treated with any medications")), but, as with Dr. Mooney's and Bergeron's Evaluation, there is no indication in Dr. Swami's report that he considered *why* Bordulis did not take pain medication. Moreover, as noted above, the record demonstrates that Bordulis did in fact take pain medication at various times during the alleged disability period.

Third, Dr. Swami does not explain his finding that "comments on [Bordulis's] ADL limitations are inconsistent with exam." (AR 396.) It appears the referenced "exam" is the July 2010 examination performed by Dr. Bicknell, wherein, as discussed above, Dr. Bicknell noted that Bordulis's back was "very, very tender to right of L3," that Bordulis had "[e]ssentially no extension," and that Bordulis had "[s]evere low back pain secondary to trauma" and "Hepatitis C causing fatigue." (AR 367.) It is unclear on what basis Dr. Swami found these examination notes to be inconsistent with Dr. Bicknell's comment that "[Bordulis] has severe restriction of daily activities." (*Id.*) On their face, the examination notes and comments are entirely consistent, i.e., Bordulis had significant pain and lack of extension on examination, resulting in significant restriction of daily activities. Furthermore, the record supports that Bordulis's daily activities were significantly restricted: he appears to have been engaging in virtually no activities as of the October 2011 administrative hearing, other than gathering sticks for fires to keep himself warm. (AR 45-46, 54.) In a Function Report prepared in March 2010 (before Bordulis lost his home), Bordulis reported that he was able to do necessary activities like

16

cooking, cleaning, and grocery shopping; but only for very short periods of time before pain forced him to stop. (AR 224-27, 229, 231.) This is compared to before the alleged disability period, when, according to Bordulis and his daughter, Bordulis engaged in sports including skiing and hiking, cared for his daughters, participated in community events, and worked in the construction and cooking fields. (AR 55-60, 226, 228.)

Finally, as Bordulis points out, Dr. Swami's August 2010 opinion was rendered prior to the preparation of other relevant evidence which may have influenced Dr. Swami to make a different opinion. Most notably, in a June 2011 medical assessment based on a physical evaluation of Bordulis, Dr. Rowland Hazard stated that Bordulis's capacity limit/physical demand level was "Below Sedentary."[8] (AR 489.) The ALJ should have factored this deficiency into his analysis of Dr. Swami's opinion, especially considering that Dr. Hazard examined Bordulis whereas Dr. Swami did not (see discussion above). Although Dr. Hazard also stated in his assessment that "[m]ore comprehensive physical testing integrated with clinical findings would be required to derive an accurate work capacity" (*id.*), and that Bordulis "may not make an appropriate [disability] candidate at this time" (AR 492), the finding – after examination – that Bordulis's functional capacity was below sedentary is significant. Other significant observations made by Dr. Hazard in his June 2011 assessment include the following:

> [Bordulis's] physical exam findings reveal tenderness on the right side of the lumbar spine in the paraspinal musculature. *He is severely limited in his range of motion on both flexion and extension causing his right-sided low back pain.* He also stands in a flexed forward posture with no scoliosis.

---

[8] Of note, Dr. Hazard stated in his assessment that, "[d]uring physical testing, [Bordulis's] participation level was high." (AR 489.)

17

> . . . [T]here is some increased back pain with straight leg raise. His imaging reveals degenerative changes throughout the lumbar spine but the most significant finding is the atrophy in the right paraspinal musculature starting at about the L4 level. This leads me to feel *the patient is dealing with a chronic low back pain that is associated with a traumatic fall and severe right paraspinal muscle atrophy.*

(*Id.* (emphases added).) Dr. Hazard continued:

> I discussed with [Bordulis] that we will not likely be able to cure his pain symptoms based on the traumatic fall that he had. There is also severe muscle atrophy which will not likely completely regenerate. Potentially if []he is diligent and has a right mindset he can improve his function and return to a more normal level[,] though it may never get to the point where he was prior to the accident.

(*Id.*) These observations are consistent with other findings of paraspinal muscle pain documented in medical treatment notes, emergency room visits, physical therapy treatment notes, and Dr. Bicknell's consultative evaluation. (*See, e.g.,* AR 331, 333, 354, 367, 383, 385-86, 390, 400, 431, 500-01.)

Nonetheless, the ALJ gave "[l]imited weight" to Dr. Hazard's assessment, finding it to be "cursory" and "inconsistent with the evidence of record as a whole, including medically[-]documented findings with regard to [Bordulis's] impairments." (AR 19.) The ALJ does not specify what "medically[-]documented findings" are inconsistent with Dr. Hazard's observations, and does not adequately acknowledge the evidence cited above which is in fact *consistent* with Dr. Hazard's assessment. Nor does the ALJ explain how the assessment was "cursory." In fact, the assessment appears to have entailed a fairly extensive examination, including range of motion, endurance, and functional strength testing. (AR 489.) Ironically, "cursory" more aptly describes Dr. Swami's opinion – to which the ALJ afforded substantial weight – considering that it was

based merely on a review of the record rather than on any examination or testing.

## Conclusion

Given the ALJ's failure to properly analyze Bordulis's mental illness and unsupported analysis of the medical opinions, the matter should be remanded to the ALJ for reconsideration starting at step two, including determination of a new RFC. I therefore recommend that Bordulis's motion (Doc. 10) be GRANTED, in part; the Commissioner's motion (Doc. 11) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 10th day of October, 2012.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).